MORGAN, LEWIS & BOCKIUS LLP
DARYL S. LANDY, SBN 136288
E-mail: dlandy@morganlewis.com
CARRIE A. GONELL, SBN 257163
E-mail: cgonell@morganlewis.com
JOHN D. HAYASHI, SBN 211077
E-mail: jhayashi@morganlewis.com
5 Park Plaza, Suite 1750
Irvine, CA  92614
Tel:  949.399.7000
Fax:  949.399.7001

SAM S. SHAULSON, *Admitted Pro Hac Vice*
E-mail: sshaulson@morganlewis.com
101 Park Avenue
New York, New York  10178-0060
Tel:  212.309.6000
Fax:  212.309.6001

Attorneys for Defendant
CHASE INVESTMENT SERVICES CORP.

## THE UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MICHAEL ALAKOZAI and STEVEN PITTS individually and on behalf of all others similarly situated, <br><br> Plaintiffs, <br><br> vs. <br><br> CHASE INVESTMENT SERVICES CORP., <br><br> Defendant. | Case No. 11-CV-09178-SJO-JEMx <br><br> Hon. S. James Otero <br><br> **DEFENDANT CHASE INVESTMENT SERVICES CORP.'S OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION** <br><br> Date:        September 22, 2014 <br> Time:        10:00 A.M. <br> Courtroom:   1 |

## I.  **INTRODUCTION**

In their Class Certification Motion ("Motion"), Plaintiffs Alakozai and Pitts ("Plaintiffs") seek what no court has ever done:  certify a Rule 23 class action of Financial Advisors ("FAs") who seek overtime pay.  In every prior case – at least nine, including one against Defendant Chase Investment Services Corp. ("CISC") – the court denied class certification finding too many individualized issues.  This Court, for example, just concluded that the overtime exempt status of FAs "will turn on individualized inquiries, dependent on the way in which the particular FA performs his or her job, where they spend their time performing their job, and the manner and amount in which they were compensated."  *Litty v. Merrill Lynch & Co., Inc.*, No. 14-CV-0425-PA-PJWx (C.D. Cal. Aug. 4, 2014), Dkt. 90 at 7.

Plaintiffs allege overtime claims under both California and Federal law.  Third Am. Compl. ("TAC") ¶¶29-36.  As such, FAs can be exempt from overtime under various California and Federal exemptions, including administrative, professional, executive, highly compensated employee, commissioned salesperson, outside salesperson, or a combination of these exemptions.  For example, for more than 65 years, U.S. Department of Labor ("DOL") regulations have provided that FAs can qualify for the administrative exemption, and the DOL reaffirmed those regulations in an Opinion Letter in 2006.  29 C.F.R. §541.207(d)(2) (1949) (referencing "a customer's man in a brokerage house"); 29 C.F.R. §541.203(b) (2004); 69 Fed. Reg. 22122, 22145 (Apr. 23, 2004) (preamble to current regulation); DOL Op. Ltr., FLSA 2006-43 (Nov. 27, 2006); *see also Hein v. PNC Fin. Servs. Grp., Inc.*, 511 F. Supp. 2d 563, 570-75 (E.D. Pa. 2007) (administrative exemption applied to FAs); *Taylor v. Waddell & Reed, Inc.*, 2012 WL 10669, at *3-5 (S.D. Cal. Jan. 3, 2012) (outside sales exemption applied to FAs); *In re RBC Dain Rauscher Overtime Litig.*, 703 F. Supp. 2d 910, 942-47 (D. Minn. 2010) (highly compensated exemption applied to FAs).  Accordingly, to adjudicate Plaintiffs' claims, the Court would

need to make factual findings for each of over 1,200 CISC FAs[1] who worked at 1,054 bank branches or other locations under many different supervisors (CE[2] 4 at ¶3; CE 26 No. 1) as to, *inter alia*:

- each of the job duties the particular FA performed and the amount of time the FA spent performing each job duty;
- the nature, type, and frequency of decisions and/or recommendations the FA has made for each client;
- the extent to which the FA has exercised discretion and independent judgment;
- the location where the FA performed each job duty;
- the amount and level of managerial oversight each FA has received;
- the extent to which the FA has used his or her education and professional experience in the performance of his or her duties;
- the amount of annual compensation each FA earned each year; and
- whether each FA incurred business expenses for which CISC did not reimburse the FA, whether those expenses were necessary and reasonable, whether the FA sought reimbursement, and if not, the reasons for not seeking reimbursement.

Plaintiffs have not even come close to meeting *__their__* rigorous burden to show that these findings can be made on a class-wide basis because individualized inquiries pervade these issues. Alakozai, for example, claims that he was a mere "order taker" and "salesperson" required to ask form questions, never made his own investment recommendations, and made under $34,000 in his ten months with CISC in 2009. CE 1 at 237:18-24, 259:2-12; 262:17-23; CE 9. Other FAs, however, have built trusted advisor relationships with their clients, have autonomy to recommend from thousands of different investments without manager approval, have never followed a form, have managed investment portfolios of more than $100 million, regularly worked from outside the office, and have made close to                per year. CE 16-24, 27-28; 25 ¶ 4.

Not only do individualized inquiries predominate and make a trial of this case unmanageable, but Plaintiffs also have not established typicality or adequacy. While they seek to represent the interests of other FAs who in various ways advise

---

[1] "FA" used herein means Financial Advisors, Financial Advisor Associates, Senior Financial Advisors, and Independent Financial Advisors. Motion at 1, n.1.
[2] "CE" refers to CISC's concurrently-filed Compendium of Evidence.

clients on managing their money, Plaintiffs collectively filed for personal bankruptcy *nine* times. CE 37-55.  Both are not credible and face unique defenses, *having failed to list their claims in this action on their bankruptcy filings*, contradicted their deposition testimony in their declarations in support of their Motion, and verified false interrogatory responses.  Alakozai also conceded making false allegations in another federal court case against a former employer, and was statutorily *disqualified* from holding an FA license for "untrustworthy behavior."

This Court should follow every other court and deny class certification.

## II.   LEGAL STANDARDS.

The standard for class certification is high:  A class may only be certified if after a "rigorous analysis" the trial court is satisfied that the proposed class meets all Rule 23(a) requirements – numerosity, commonality, typicality, and adequacy.  *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 979-80 (9th Cir. 2011); Fed. R. Civ. P. 23(a).  Plaintiffs must also establish at least one of the subparts of Rule 23(b) – that "questions of law or fact common to class members predominate over any questions affecting only individual class members," and "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).  As shown below, Plaintiffs cannot meet these standards.

## III.   THE COURT SHOULD DENY CLASS CERTIFICATION OF ALL OF PLAINTIFFS' CLAIMS.

### A.   Plaintiffs' Overtime Claims Lack Commonality, and Individualized Issues Predominate.

To establish commonality under Rule 23(a)(2), "a plaintiff may not meet this burden merely by 'the raising of common questions – even in droves.'"  *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551 (2011).  "Rather, the class members' claims must depend upon a common contention [that is] of such a nature that it is capable of class-wide resolution . . ."  *Id.*  Thus, "what matters to class certification . . . [is] the capacity of a class-wide proceeding to generate common *answers* apt to drive the resolution of the litigation."  *Id.*  Plaintiffs also must satisfy the more stringent requirements for predominance under Rule 23(b)(3).  A Rule 23(b)(3)

1  action is inappropriate if individualized issues predominate.  *Zinser v. Accufix*

2  *Research Inst., Inc.*, 253 F.3d 1180, 1189 (9th Cir. 2001).  "[P]redominance is a

3  more rigorous requirement than the Rule 23(a)(3) commonality prerequisite."

4  *Gonzalez v. Millard Mall Servs., Inc.*, 281 F.R.D. 455, 466 (S.D. Cal. 2012).

5      At the class certification stage, ***the plaintiffs*** have the burden of establishing

6  that class certification is appropriate, *i.e.*, that their misclassification claims can be

7  manageably resolved for all class members through common proof.  *Marlo v.*

8  *United Parcel Serv., Inc.*, 639 F.3d 942, 947-48 (9th Cir. 2011); *Litty*, Dkt. 90 at 4

9  (to certify class of FAs, plaintiff bears burden "to submit evidence that the entire

10  proposed class was misclassified as exempt").[3]  Here, Plaintiffs did not submit

11  evidence that CISC misclassified the entire proposed class of FAs as overtime

12  exempt, and FAs may be exempt under numerous exemptions.  Thus, the Court

13  "must consider the full range of factors . . . when determining whether issues

14  common to the class would predominate . . . ."  *In re Wells Fargo Home Mortgage*

15  *Overtime Pay Litig.*, 268 F.R.D. 604, 610 (N.D. Cal. 2010).  Where analyzing the

16  time each employee spent on exempt duties is required, courts repeatedly have

17  denied class certification.  *Vinole v. Countrywide Home Loans, Inc.*, 571 F.3d 935,

18  946-47 (9th Cir. 2009) (no common issues "where exempt status depends upon an

19  individualized determination of an employee's work"); *Litty,* Dkt. 90 at 7; *Jimenez*

20  *v. Domino's Pizza, Inc.*, 238 F.R.D. 241, 251 (C.D. Cal. 2006).

21      Accordingly, every court that has addressed class certification of FAs' overtime

22  claims has rejected class certification – including a case involving CISC FAs.

23  *Bachrach v. Chase Investment Servs. Corp.*, 2007 WL 3244186 (D. N.J. Nov. 1,

24  2007); *see also Litty*, Dkt. 90; *Drake*, 2010 WL 2175819; *In re RBC*, 703 F. Supp.

25  2d 910; *Perry-Roman v. AIG Retirement Servs., Inc.*, 2010 WL 8697061 (C.D. Cal.

26  Feb. 24, 2010); *Perry v. U.S. Bank*, 2001 WL 34920473 (N.D. Cal. Oct. 16, 2001);

27

28

---

[3] Plaintiffs overlook that *they* have the burden of proof on a class certification motion.  Dkt. No. 117, Motion at 7:5-10:25 ("Mot.").

1   *see also Burakoff & Alakozai v. US Bancorp*, No. BC341430 (Cal. Super. Ct. May

2   25, 2011) (decertifying Alakozai's overtime claims against prior employer);

3   *Handler v. Oppenheimer & Co.*, No. BC343542 (Cal. Super. Ct. Oct. 9, 2007);

4   *Ubalde v. Prudential Secs., Inc.*, No. BC234149 (Cal. Super. Ct. Nov. 1, 2004).

5   **1.    Common Evidence Cannot Prove the Inapplicability of the Administrative Exemptions.**

6   Plaintiffs have not met their burden to establish that the administrative

7   exemptions under California or Federal law do not apply to a class of FAs.

8   Plaintiffs spend much of their Motion discussing the industry rules designed to

9   protect investors, but present virtually no evidence on what FAs actually do.

10   a.    FAs Have Performed A Wide Range of Duties.

11   To determine whether any given FA is exempt under the California

12   administrative exemption, the Court must review the duties he or she performed, and

13   whether he or she spent more than half of his or her time on exempt duties. Wage

14   Order ("W.O.") 4-2001 §1(A)(2); *Wells Fargo*, 268 F.R.D. at 611. Similarly, under

15   the federal regulations, the Court must determine whether exempt administrative

16   duties were the FA's "primary duty." 29 C.F.R. §541.200.

17   Here, Plaintiffs offer no common proof that could determine whether any FA,

18   much less the entire putative class, spent less than half his or her time engaged in

19   these exempt duties, or whether these exempt duties were not his or her primary duty.

20   ***Indeed, Alakozai conceded that he had "no idea" what other FAs do and Pitts***

21   ***conceded that certain FAs perform their jobs "very different."*** CE 1 183:14-17,

22   188:8-10, 195:14-196:7, 211:3-10; CE 2 33:17-24, 90:23-91:19, 123:24-124:10.

23   As another federal court held, determining whether the administrative

24   exemption applies to ***CISC FAs*** "would require individual exploration of each

25   member's specific work habits." *Bachrach*, 2007 WL 3244186 at *3. FAs describe

26   vast differences in their performed duties, and in the amount of time they have spent

27   performing them. For example:

28

- Whereas Alakozai and Pitts say they had to follow a form to identify client investment objectives and CISC's limited recommended investments, other FAs say they never used the forms and were free to recommend from thousands of investment options. *Compare* CE 1 240:5-8, 262:17-23; CE 2 235:2-10, 243:3-18; *with* CE 4 ¶4 (over 2,100 mutual funds available); CE 16 ¶11 (no limits on advice); CE 17 ¶¶4-6 (could offer hundreds of investments); CE 19 ¶15.

- Whereas Alakozai says he never discussed the advantages and disadvantages of possible investments with clients, other FAs said they always discussed the advantages and disadvantages with clients. *Compare* CE 1 259:7-17; *with* CE 16 ¶12; CE 17 ¶7; CE 19 ¶¶11, 14; CE 20 ¶10; CE 22 ¶7.

- Whereas Plaintiffs say managers told them which investments to recommend, other FAs say managers never gave such instructions and they could make their own recommendations. *Compare* CE 1 203:9-25; CE 2 63:24-25; *with* CE 16 ¶19; CE 17 ¶7; CE 18 ¶7; CE 19 ¶12; CE 20 ¶7; CE 21 ¶10; CE 22 ¶9.

- FAs have spent anywhere from 33%-80% of their day meeting with clients. *See* CE 19 ¶¶7, 9, 11 (33%); CE 18 ¶14 (50%); CE 22 ¶12 (70%).

- Whereas Alakozai and Pitts spent all of their time attempting to "sell" investments to clients, other FAs spent much of their time learning and understanding clients' needs and financial situations and creating financial plans for clients. *Compare* CE 1 271:7-9; CE 2 65:21-66:3; *with* CE 16 ¶¶10-14; CE 17 ¶6; CE 18 ¶12; CE 19 ¶¶7-9; CE 20 ¶¶5, 10; CE 21 ¶4; CE 24 ¶¶6, 8.

- Whereas some FAs spent most of their day marketing their services, other FAs spent no or very little time marketing their services. CE 2 216:4-15 (marketing "wasn't worth it"); CE 22 ¶12 (15%); CE 23 ¶5 (70%); CE 24 ¶9.

- Whereas some FAs used scripts to communicate with prospective clients, other FAs never used scripts to communicate with prospective clients. *Compare* CE 2 163:16-164:9; *with* CE 16 ¶18 ("I don't have to follow any scripts and I don't do so"); CE 24 ¶7 ("free-flowing discussions").

- Whereas some FAs spoke with their manager daily, other FAs spoke with their manager less than once a week. *Compare* CE 1 51:15-20 (daily); *with* CE 17 ¶9 (few times a month); CE 18 ¶7 (weekly); CE 21 ¶10 (weekly).

- Whereas Alakozai and Pitts say they worked 60-65 hours per week, other FAs worked 35-40 hours per week. *Compare* CE 6 No. 4 and CE 8 No. 4 (60-65) *with* CE 18 ¶15 (35); CE 21 ¶11 (40 or less); CE 24 ¶13 (35-40).

Plaintiffs offer no way to adjudicate the administrative exemption without a painstaking fact inquiry of each FA's actual, day-to-day work duties to determine whether a particular FA spent less than half of his or her work time on those exempt duties or whether the FA's primary duty did not comprise exempt duties.[4]

---

[4] That CISC has classified all FAs as exempt is not determinative and "does nothing to facilitate common proof on the otherwise individualized issues." *In re Wells Fargo Home Mortgage Overtime Pay Litig.*, 571 F.3d 953, 959 (9th Cir. 2009) (reversing class certification of loan officers' overtime claims). Indeed, every court has rejected class certification of FAs' overtime claims even though defendants in the other cases likewise decided to treat all financial advisors as exempt and maintained that classification consistent with regulations and interpretations from both the DOL and the DLSE. *See, e.g., Litty,* No. 14-CV-00425-PA-PJW, Dkt. No.

1

            b.      Determining Whether FAs Operate Under More Than "General Supervision" Requires Individual Inquiries.

2

        Plaintiffs erroneously contend that industry rules and Chase guidelines

3

implementing them impose "supervision" requirements such that FAs class-wide

4

cannot meet the California administrative exemption's "general supervision"

5

requirement.  Mot. at 11.  First, Plaintiffs' contention flies in the face of the

6

DLSE's own manual.  Of all possible jobs, *the DLSE chose FAs – "customers'*

7

*brokers in stock exchange firms"– to exemplify "Employees who perform special*

8

*assignments under only general supervision."*  DLSE Manual §52.3(3) (2002).

9

        Second, Plaintiffs ignore the differences between "supervision" in the

10

regulated securities industry with "supervision" under the California administrative

11

exemption.  One court in this district described more than "general supervision" for

12

purposes of the California administrative exemption as "direct and specific

13

supervision by superiors."  *Delodder v. Aerotek, Inc.*, 2010 U.S. Dist. LEXIS

14

146038, at *55 (C.D. Cal. Aug. 16, 2010) (requirement to attend three daily

15

meetings did not create common question on general supervision prong), *aff'd*, 471

16

Fed. Appx. 804 (9th Cir. Mar. 15, 2012).  The federal securities laws, on the other

17

hand, require firms to create a system to "supervise" activities "that is reasonably

18

designed to achieve *compliance with applicable securities law and regulations*."

19

FINRA Rule 3010 (emphasis added).  These laws are intended to protect the

20

investing public from *improper practices*, such as insider trading, excessive trading

21

in accounts, financial fraud, and elder abuse, and suggest that firms adopt policies

22

to monitor *trading.  See, e.g., McDaniel v. Wells Fargo Investments, LLC*, 717 F.3d

23

668, 673-76 (9th Cir. 2013); CE 34, 36, 57 (current and former FINRA Rules,

24

Bulletin, Notice).  These rules do not dictate to FAs when to work, where to work,

25

which clients to meet with and when, which investments to recommend, or how to

26

77 (relying upon DOL guidance to justify FA exemption classification).  In

27

*Bachrach*, despite concluding that CISC FAs likely are exempt and perform the duties set forth in the regulations, the district court denied class certification

28

because individual questions "of each employee's work habits" predominated. 2007 WL 3244186, at *1-*3.

1   conduct their investment analyses and advise clients.  CE 16-24.  Market directors,

2   who speak with FAs infrequently, are the supervisors.  CE 3 212:2-6; CE 21 ¶10.

3   In contrast,

4

5

6                          Dkt. 117-2, Ex. MM at 6 (2008 Registered Representative

7   ("RR") Manual) (emphasis added); CE 3 156:19-157:12.  The policies and

8   procedures CISC adopted to comply with FINRA rules and to protect investors by

9   reviewing transactions "after the fact" are far from any kind of restriction making

10  FAs subject to direct supervision for California Labor Code purposes.

11       Third, the same rules and policies to which Plaintiffs cite support CISC's

12  position because they empower FAs to act *independently* and to use their judgment

13  with each client to make proper, tailored investment recommendations based on

14  each client's unique financial circumstances and objectives.  FINRA Rule 2111

15  (FAs must use "reasonable diligence" to profile each customer based on various

16  factors, including life circumstances, financial situation, needs, tax status, objectives

17  and risk tolerance, and must use that information to develop "suitable for the

18  customer" recommendations)); Dkt. 117-2, Ex. QQ at 67-68 ("The individual

19  making the recommendation must have a reasonable understanding of the security

20  when making such a recommendation.  JPMS RRs must then have a reasonable

21  basis to believe that the recommendation is suitable for a particular customer based

22  on that customer's investment profile"); *Perry-Roman,* 2010 WL 8697061 at *6

23  ("The employee training manual itself encourages FAs to respond to each potential

24  customer's highly individualized needs").  FAs must know and understand these

25  rules, and then operate *autonomously* within them.  CE 20 ¶5.[5]

26

---

27  5 CISC provides the Registered Representative Manual from which Plaintiffs cite
    "to assist [FAs] in complying with Federal, FINRA, MSRB or State securities and
28  insurance rules and regulations" not to restrict the FAs from performing their jobs
    independently.   Dkt. 117-2, Ex. QQ at 5.

Morgan, Lewis &
Bockius LLP
Attorneys At Law
Irvine

DB2/ 25279137.15

1      Fourth, courts in the Ninth Circuit agree that being subject to laws and

2  industry standards does not create a common issue as to whether employees are

3  subject to more than general supervision for purposes of the California

4  administrative exemption. *Brady v. Deloitte & Touche LLP*, 2012 WL 1059694, at

5  *7-8 (N.D. Cal. Mar. 27, 2012); *Delodder*, 2010 U.S. Dist. LEXIS 146038 at *55-

6  56*; Nguyen v. BDO Seidman, LLP*, 2009 WL 7742532, at *6 (C.D. Cal. July 6,

7  2009) (denying class certification due to the "need for an individual inquiry as to

8  the level of supervision over each putative class member"); *Mekhitarian v. Deloitte*

9  *& Touche (ICS), LLC*, 2009 WL 6057248, at *4-5 (C.D. Cal. Nov. 3, 2009)

10  ("Virtually every employee – no matter how high ranking – is subject to some

11  degree of supervision by a superior").  Where testimony shows, as here, that putative

12  class members are subject to varying degrees of supervision, industry rules "do not,

13  on their own, show that class members are subject to any uniform level of

14  supervision." *Brady*, 2012 WL 1059694 *at 7 (granting motion to decertify class).[6]

15      Indeed, as reflected in the FAs statements, the level of oversight any

16  particular FA experienced calls for individualized inquiries.  The evidence reflects

17  that CISC managerial practices, and the amount of autonomy FAs exercise, has

18  varied widely from one FA to another, and even with different managers for the

19  same FA.  *See, e.g.*, CE 17 ¶9 (two managers); CE 22 ¶9 (varying management

20  styles); CE 28 ¶3.  For example, Pitts testified that when he worked at the Laguna

21  branch, his manager was upstairs and he saw him frequently.  When he moved to

---

[6] Moreover, the administrative exemption applies even in situations in which the employer's detailed instructions or industry regulations confine the employees' discretion in the performing their duties.  *See, e.g., Roe-Midgett v. CC Servs., Inc.*, 512 F.3d 865, 875 (7th Cir. 2008) (claims adjusters exercised independent judgment despite manuals and estimating software to guide their work); *Kennedy v. Commonwealth Edison Co.*, 410 F.3d 365, 374 (7th Cir. 2005) (administrative exemption applied to nuclear power plant employees despite extensive government regulations); *Donovan v. Burger King Corp.*, 675 F.2d 516, 521-22 (2d Cir. 1982) (assistant managers exempt despite adherence to "detailed instructions").

1   Orange, he had much less interaction with his manager – until he was put on a

2   performance improvement plan.  CE 2 121:9-122:4.  Some FAs spoke with their

3   manager once a day (CE 1 51:9-23), whereas for others it was once a week (CE 18

4   ¶7) or less frequently (CE 17 ¶9).  The notion that FAs who operate independently

5   in and outside bank branches and spoke with their manager once a week somehow

6   are all subject to more than general supervision is baseless, as the DLSE has

7   concluded, and cannot justify certifying the class.

8        Furthermore, even if Plaintiffs' contention were correct, which it is not, it

9   addresses only the California administrative exemption.  The federal administrative

10  exemption – and all of the other exemptions that might apply to FAs – has no such

11  "general supervision" requirement and would still apply and need to be analyzed

12  for each individual FA.  29 C.F.R. § 541.200.  Focusing as Plaintiffs request on the

13  "general supervision" prong of the California administrative exemption will not

14  avoid the individual inquiries necessary to adjudicate each FA's exemption status.[7]

            c.    Common Evidence Cannot Show Whether FAs Are
                  Engaged Primarily in "Sales."

16       Plaintiffs contend the two administrative exemptions do not apply because

17  FAs are engaged in "sales."  Mot. at 4.  However, to adjudicate whether any

18  particular FA spent more than half or primarily spent his or her time on "sales" or

19  exempt administrative duties under the Federal Regulations (which California

20  follows) requires a "detailed, fact-specific determination."  *Perry*, 2001 WL

21  34920473 at *6-7; *see also Bachrach,* 2007 WL 3244186 at *3.  Here, while

22  Plaintiffs claim they were trying to "sell" investments to clients on a transactional

23  basis (CE 1 217:2-11; CE 2 243:19-20), other FAs spent much of their time

24  meeting with clients to build "trusted advisor" relationships, evaluate each client's

25  financial situation, and to discuss the client's existing investment portfolios.  *See*

26  ───────────────
27  [7] Plaintiffs' request to certify an overtime misclassification claim under California
    law makes no sense given Plaintiffs' allegations that they were mere "inside
    salespeople that Defendant paid on a commission basis."  TAC ¶22.  If accepted as
28  true, these allegations would make Plaintiffs exempt under the California inside
    salesperson exemption.  W.O. 4-2001 §3(D).

1   CE 16 ¶¶10-14; CE 19 ¶¶7-11; CE 18 ¶14; CE 22 ¶12; CE 24 ¶10.  Some FAs

2   received the majority of their compensation from fees for providing advice, not

3   from commissions on transactions.  *See* CE 23 ¶ 4 (99%).   FAs also report vast

4   differences in the amount of time they have spent marketing and seeking out new

5   clients.  *See* CE 1 243:5-9 (2-3 hours per day); CE 23 ¶5 (70% developing new

6   clients); CE 18 ¶14 (20%).  The Court would be mired in hundreds of mini-trials to

7   ascertain if any particular FA spent more than half of his or her time on sales duties.

8              d.     Whether FAs Service "Businesses" Requires
                      Individualized Inquiries.

9           Plaintiffs contend that FAs are categorically ineligible for the California or

10  Federal administrative exemptions because FAs primarily service individuals rather

11  than businesses.  Mot. at 15-16.  Plaintiffs' theory is wrong on multiple levels, and

12  cannot serve as common evidence to adjudicate the administrative exemption.

13          First, Plaintiffs' sole authority for this argument is a ***vacated*** DOL

14  Administrative Interpretation ("AI") purported to apply only to loan officers.

15  *Mortgage Bankers Ass'n v. Harris*, 720 F.3d 966, 972 (D.C. Cir. 2013) (vacating

16  AI), *cert. granted*, 134 S. Ct. 2820 (June 16, 2014).  Second, with respect to FAs,

17  the DOL has stated consistently for more than 65 years and the DLSE agrees that

18  FAs can qualify for the administrative exemption regardless of whether the clients

19  are individuals or businesses.  29 C.F.R. §541.207(d)(2)(1949); 29 C.F.R.

20  §541.203(b) (2004); 69 Fed. Reg. 22122, 22145; DOL Op. Ltr., FLSA 2006-43;

21  DLSE Manual §52.3(3).  Third, Plaintiffs cite CISC's Plans submitted to FINRA for

22  the proposition that CISC "does not currently conduct a securities business with

23  institutional clients."  Mot. at 16.  However, "institutional" clients and "business"

24  clients are not synonymous.  CE 3 162:3-163:8.  The fact is that some FAs do

25  service business clients.  *Id.*; CE 19 ¶8; CE 22 ¶6; CE 23 ¶3.  Thus, even if the

26  DOL AI had not been vacated and applied to FAs, individualized inquiries would

27  be required to determine which FAs serviced businesses and the amount of time

28  they spent servicing them.  Even Plaintiffs have declared, under penalty of perjury,

that they "primarily serviced businesses rather than individuals." Dkt. 117-5 ¶3; Dkt. 117-6 ¶3. Plaintiffs propose adjudicating this issue by reviewing new account documents for *each CISC client*: "whether a customer is an individual or a business is easily identifiable on the account opening document in Defendant's possession." Mot. at 16. Some FAs have as many as 700 current clients and 1,500 current accounts. CE 20 ¶12; CE 24 ¶11. The fact alone of whether a particular client is an individual or a business could not reflect the amount of time each FA spends servicing business clients, for an FA could spend more time on business clients than on individual clients. Plaintiffs' proposal therefore would impose the burden first of reviewing hundreds of thousands of new account documents on an individual basis, and then require the Court determine how much time the FA spent servicing the business accounts. That process would be woefully unmanageable.

### 2. Plaintiffs Fail to Establish Common Evidence to Adjudicate The Federal Highly Compensated Exemption.

Plaintiffs allege that FAs earn on average $100,000 annually (TAC ¶10) but their Motion does not address whether the federal "highly-compensated" exemption can be decided on a class-wide basis. This, by itself, justifies denying the Motion. *See* CE 25 ¶4                                                      . The highly-compensated exemption applies to any employee with total annual compensation of at least $100,000 *as long as the employee customarily and regularly performs any one exempt executive, administrative, or professional duty*. 29 C.F.R. §541.601(a). Plaintiffs cannot show that this exemption does not apply on a class-wide basis. *See In re RBC*, 703 F. Supp. 2d at 969 (denying class certification due to "painstaking and fact-intensive inquiry with respect to each individual plaintiff's actual, day-to-day work duties in order to determine whether the plaintiff qualifies for the exemption").

### 3. Plaintiffs Fail to Establish Common Evidence to Adjudicate the California or Federal Outside Salesperson Exemptions.

To the extent any FA may be engaged in "sales" more than 50% of the time,

1  the overtime exemptions applicable to salespersons may apply.  An employee may

2  be exempt under the California outside salesperson exemption if he or she spends

3  more than half of his or her time outside the office engaged in sales or sales-related

4  activities.  W.O. 4-2001 §§1(C), 2(M); *Ramirez v. Yosemite Water Co., Inc.*, 20

5  Cal. 4th 785, 801 (1999).  Similarly, employees may be exempt under the federal

6  outside sales exemption if their "primary duty" is making sales regularly outside of

7  the office.  29 C.F.R. §541.500(a)(2); *see Taylor*, 2012 WL 10669 at *4 (outside

8  sales exemption applied where FA spent 30-40% of time on sales outside office).

9      Whether the California outside sales exemption applies, however, "poses the

10  greatest problem from a predominance perspective" because it "focuses solely on

11  where an employee completes his or her work."  *Wells Fargo*, 268 F.R.D. at 613.

12  Determining whether the exemption applies to any given FA would call for

13  hopelessly individualized inquiries into the amount of time each FA spent outside

14  his or her office engaged in sales or sales-related activities, which are not

15  susceptible to class treatment.  *See Vinole*, 571 F.3d at 945-46; *Wells Fargo*, 571

16  F.3d at 956, 959; *Litty*, Dkt. 90 at 6.  The evidence varies widely, from Pitts who

17  claims he worked almost always in the branch (CE 2 97:16-25), to Alakozai who

18  testified that he spent 20-30% of his time outside his branch (CE 1 183:10-13), to

19  other FAs who spent anywhere from 5%-80% outside the branch.  *See*, *e.g.*, CE 20

20  ¶8 (mostly inside); CE 23 ¶5 (previously 80% outside).  Plaintiffs offer no method

21  of common proof to adjudicate whether the outside sales exemption applies to each

22  FA, but instead argue that CISC cannot apply sales-related exemptions because

23  "Defendant cannot assert that CMs are primarily involved in giving advice and at

24  the same time state that their primary duty is sales."  Mot. at 18.  Plaintiffs miss the

25  point.  Different exemptions may apply to different FAs based on the duties they

26  *actually* performed and the amount of time they spent on those duties, which make

27  class certification inappropriate.  *See Wells Fargo*, 571 F.3d at 956, 958-59 (noting

28  "individualized inquiries" were necessary to determine various federal and

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
IRVINE

DB2/ 25279137.15

13

California exemptions, including outside sales, and that district court abused discretion in holding uniform policies established predominance).  Moreover, multiple exemptions could apply to the same FA, including the sales and administrative exemptions.  *Delgado v. Ortho-McNeil, Inc.*, 476 Fed. Appx. 133 (9th Cir. Aug. 14, 2012) (administrative exemption and outside sales exemption both apply to pharmaceutical sales reps); *Waddell*, 2012 WL 10669 at *2, n.2 .

### 4. **Plaintiffs Fail to Establish Common Evidence to Adjudicate the Commissioned Salesperson Exemptions.**

Similarly, if any particular FA is engaged in inside "sales" more than 50% of his or her time (TAC ¶22), as Plaintiffs contend, then some FAs may be exempt from overtime under the California and Federal commissioned salesperson exemptions, which apply if the employee's earnings exceed one and one-half times the minimum wage and more than half of that employee's compensation represents commissions or incentive compensation.  W.O. 4-2001 §3(D); 29 U.S.C. §207(i) (federal exemption).  Even if certain FAs did not qualify for the federal exemption, they still could qualify for the California commissioned employee exemption.  Making that determination requires evaluating for each FA whether and the amount of time the FA engaged in sales, and for each FA whether more than half of his or her compensation represents commissions.  Plaintiffs do not address how they plan to adjudicate the California exemption by common proof.

### 5. **Common Proof Cannot Decide the Professional Exemption.**

Plaintiffs also have not met their burden to demonstrate that common proof can determine whether FAs qualify for the professional exemption.  W.O. 4-2001 §1(A)(3);[8] 29 C.F.R. §541.301(a).  Adjudicating the professional exemption requires fact-specific inquiries because "the crucial touchstone for the professional exemption . . . is the employee's actual job duties and responsibilities."  *Campbell v. PricewaterhouseCoopers, LLP*, 642 F.3d 820, 827, 830 (9th Cir. 2011);

---

[8] A bachelor's degree can meet the exemption's "advanced knowledge" requirements.  *See* DLSE Manual §54.8.1; *Medepalli v. Maximus, Inc.*, 2008 WL 958045, at *5 (E.D. Cal. Apr. 8, 2008).

1   *Mekhitarian,* 2009 WL 6057248 at *3-4 (deciding professional exemption "would

2   require case-by-case analysis and would not be amenable to common proof").

3         FAs have a wide variety of educational and professional experience,

4   including many with advanced degrees, certifications, and training on which they

5   rely to provide advice to clients.  *Compare* CE 1 31:6-9 (did not use his economics

6   degree); *with* CE 18 ¶¶10-11 (accounting and management B.A. "critical to my

7   success").  Determining whether such education and experience can assist any

8   particular FA in a material way, and/or impact the duties he or she performs and the

9   time spent performing them, requires an individualized inquiry of what FAs

10  actually do that is not conducive to common proof, thus precluding certification.

### 6.    Common Proof Cannot Decide the Executive Exemption.

12        Whereas some FAs had regular managerial duties, others, including

13  Alakozai, did not.  *See* CE 18 ¶9 (oversees assistant FAs); CE 22 ¶11 (two hours

14  per day managing others).  Time spent on exempt managerial duties may be

15  combined with time spent on exempt administrative duties to determine whether an

16  FA is primarily engaged in exempt activities.  DLSE Op. Ltr. 2003.5.23, at 5.  This

17  requires the same individual analysis of duties and of the time spent doing them.

### 7.    Plaintiffs Fail to Establish Common Evidence to Adjudicate Their Wage Deduction/Expense Reimbursement Claims.

19        Plaintiffs offer no common evidence to adjudicate their wage deduction and

20  expense reimbursement claims.  Plaintiffs first claim incorrectly that under CISC's

21  FA compensation plans "compensation can be reduced for . . . 'failure to follow

22  applicable policies and procedures,' " but then state, quoting the actual plans, that

23  policy violations could result in "grid rates being reduced."  See Mot. at 18

24  (emphasis added).  The quoted language does not permit earned wages to be

25  reduced for violating firm policies designed to protect investors, but reserves

26  CISC's right to lower the commission rate paid on incentives in the future.  See

27  Dkt. 117-2, Ex. C at 6 (2008 FA Compensation Plan) ("Participant's monthly grid

28  rate may be reduced . . . .  The reduction in grid rate will apply to any monthly

1  revenue credited to the Participant beginning at a future date . . . .") (emphasis

2  added); Id., Ex. H at 7 (2012 FA Compensation Plan) (same).  Reducing an

3  employee's commission rate on future revenues is not a deduction to earned wages

4  and is entirely legal.  *See Temple v. Guardsmark, LLC,* 2010 WL 1461629, at *3-4

5  (N.D. Cal. Apr. 7, 2010) (employer may prospectively reduce employees' pay rate);

6  *Prachasaisoradej v. Ralphs Grocery Co., Inc.*, 42 Cal. 4th 217, 244 (2007).

7  Moreover, Plaintiffs offer no proof of any FA in California, including themselves,

8  subjected to any wage deductions, while others have confirmed no such deductions

9  took place.[9]  CE 17 ¶11; CE 20 ¶17; CE 23 ¶9; CE 24 ¶14.  Indeed, courts in other

10  FA cases involving at least some evidence of deductions still refused to certify

11  wage deduction claims.  *See In re RBC*, 703 F. Supp. 2d at 951-52, 969; *Drake*,

12  2010 WL 2175819 at *5; *Litty*, Dkt. 90 at 7.  The Court should do the same here.

13      As to business expenses, under California law, "questions as to whether

14  Defendants were required to reimburse employees' claimed business expenses

15  involves [sic] an individualized factual determination of whether each employee

16  (1) incurred an expense (2) that was necessary (3) and reasonable (4) as a direct

17  consequence of the discharge of his or her duties."  *Drake* 2010 WL 2175819 at *7

18  (citing Cal. Lab. Code §2802 and *Gattusso v. Harte-Hanks Shoppers, Inc.*, 42 Cal.

19  4th 554 (2007)).  In denying class certification of these claims by FAs, *Drake* held

20  "[t]hese questions alone demonstrate the predomination of individualized issues."

21  *Id.*  Plaintiffs here make no showing that they, or any other FA, incurred

22  unreimbursed business expenses or that any FA who requested expense

23  reimbursement was not reimbursed, let alone a class-wide policy of refusing

24  reimbursement.  To the contrary, Pitts testified that CISC "encouraged" FAs to

25  submit for mileage and that no one from CISC ever told him he could not be

26  reimbursed for mileage, but he does not recall ever submitting an expense report.

27

28  _____
[9] CISC confirmed in discovery that it has not deducted from compensation for violating company policies.  CE 3 95:1-96:2; Dkt. 117-2, Ex. BB ¶18.

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
IRVINE

DB2/ 25279137.15

1    CE 2 196:21-25, 198:6-10.  In addition, Plaintiffs' unsupported contention that

2    CISC "uniformly" did not reimburse FAs for "mileage for travel between branches"

3    falsely describes CISC's policy.  Mot. at 6-7.  In fact, the policy states that mileage

4    between branches is reimbursable – and at a minimum requires individual inquiries

5    into the four questions the court posed in Drake.10  Dkt. 119, Ex. 8**.**

6
### B.    Plaintiffs Do Not Have Typical Claims And They Are Not Adequate Class Representatives.

7         Proposed class representatives must establish that their claims are typical of

8    the putative class and that they will fairly and adequately represent the FAs'

9    interests.  Fed. R. Civ. P. 23(a)(3) & (4).  Where, as here, plaintiffs are subject to

10   "even an arguable" unique defense, class certification should be denied.  *Hanon v.*

11   *Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992).

12        First, Plaintiffs are atypical and inadequate class representatives because both

13   filed bankruptcies after filing their claims in this action and did not disclose their

14   claims in their bankruptcy filings.  *See* CE 11-12, 37-55; CE 1 33:4-5, 90:25-91:18

15   (acknowledging that claim disclosure on 2012 filing was for different action); CE

16   21; CE 2 40:25-41:20 (acknowledging failure to disclose).  Plaintiffs' failure to

17   disclose subjects them to unique defenses that they lack standing and are judicially

18   estopped from pursuing their claims in this action.  *See Cloud v. Northrop*

19   *Grumman Corp.*, 67 Cal.App.4th 995, 1001-02 (1998) (plaintiff declaring

20   bankruptcy lacks standing to assert overtime claims); *Rosenberg v. Renal*

21   *Advantage, Inc.*, 2013 WL 3205426, at *11 (S.D. Cal. June 24, 2013) (denying

22   class certification because bankruptcy subjected class representatives to unique

23   defenses); *White v. Wyndham Vacation Ownership, Inc.*, 617 F.3d 472, 484 (6th

24   Cir. 2010) (judicial estoppel for failing to disclose legal claims in bankruptcy).

25

26   [10] Numerous decisions have denied class certification on Labor Code §2802 claims
     for mileage reimbursement.  *See, e.g.*, *Ruiz v. Affinity Logistics Corp.*, 2009 WL
27   648973, at *8 (S.D. Cal. Jan. 29, 2009) (mileage expense reimbursement claims
     inappropriate for class treatment because it would require a "case-by-case analysis
28   where common questions do not predominate over individual questions"); *Ortiz v.*
     *CVS Caremark Corp.*, 2013 WL 6236743, at *11-12 (N.D. Cal. Dec. 2, 2013).

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
IRVINE

DB2/ 25279137.15

17

1  Second, as in *Litty*, comparing other FAs' statements to Plaintiffs' testimony

2  that they were, for example, mere "order takers" demonstrates that Plaintiffs' duties

3  were nothing like those of other FAs.  Plaintiffs fail to meet the typicality

4  requirement for this reason alone.  *See Litty*, Dkt. 90 at 5.[11]  Moreover, it is

5  inconceivable that two Plaintiffs who mismanaged their own finances to the extent

6  of filing personal bankruptcy a combined ***nine times*** (CE 11-12, 37-55) could have

7  performed their "***financial advisor***" job the same way as an FA who managed, for

8  example, over $100 million in client assets.  CE 21 ¶6 (over $170 million).

9  Third, Plaintiffs are subject to different arbitration agreements than many other

10  FAs.  Based on the language of Plaintiffs' arbitration agreements – which

11  incorporated certain FINRA rules –this Court previously denied arbitration of

12  Plaintiffs' individual claims.  Dkt. 79, *aff'd* 557 Fed. Appx. 658 (9th Cir. Feb. 7,

13  2014).  Some FAs, however, are subject to more recent arbitration agreements

14  containing an express class action waiver that courts consistently have enforced.  CE

15  5 ¶¶3-6; *see, e.g., Miguel v. JPMorgan Chase Bank, N.A.*, 2013 WL 452418 (C.D.

16  Cal. Feb. 5, 2013); *Hightower v. JPMorgan Chase Bank, N.A.*, No. 11-CV-1802-

17  PSG-PLAx, Dkt. 140 (C.D. Cal. Jan. 28, 2014); *id.* Dkt. 145 (Feb. 25, 2014).

18  Fourth, there are serious questions about Plaintiffs' credibility.  *See Drake*,

19  2010 WL 2175819 at *5 (credibility and unclean hands issues weighed against

20  finding typicality and adequacy of proposed class representatives).  Plaintiffs were

21  poor performers who signed declarations in support of class certification that

22  directly conflicted with their deposition testimony regarding business expenses

23  (*Compare* Dkt. 117-5 *with* CE 1 290:20-291:11; Compare Dkt. 117-6 with CE 2

24  196:21-25, 198:6-10), and they verified false or incomplete interrogatory responses

25  about their work hours, bankruptcies, prior litigation history, and more.  *Compare*

26  CE 1 32:21-33:6, 33:20-34:12, 166:7-12, 170:3-173:11, 297:17-298:16 *with* CE 6 at

27

28  _____
[11] Plaintiffs also cannot establish that their claims are typical of FAs employed
since 2011, because Alakozai and Pitts terminated in 2009 and 2010, respectively.

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
IRVINE

18

¶¶6, 15, 17 (Alakozai); *and* CE 2 177:5-181:22 *with* CE 7 at ¶7 (Pitts).  Also, Alakozai was statutorily disqualified from securities licensing because he did not disclose that New York state revoked his insurance license for "untrustworthy" behavior, and he admitted to lying in federal court to increase his chances of recovering in a lawsuit against a prior employer.  CE 11 at 14; CE 13-14; CE 1 40:17-44:1; CE 56.  Class certification should be denied on this basis as well.

**C.     Plaintiffs Fail to Show that Damages May Be Established on a Class-Wide Basis.**

Plaintiffs also must demonstrate that *damages* may be established on a class-wide basis.  *Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1433 (2013).  Plaintiffs have failed to offer a reliable method for determining damages because FAs did not record their time and the evidence shows hours varied greatly.  CE 6 ¶4 (60-65 hours); CE 7 ¶4 (50-55); CE 8 ¶4 (60-65); CE 18 ¶15 (35); CE 21¶11 (40).

**D.     A Class Action Is Not Superior or Manageable Given the Individualized Issues the Court Must Decide.**

The superiority requirement ensures that a class action does not "sacrific[e] procedural fairness or bring[ ] about other undesirable results."  *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 615 (1997).  The party seeking certification bears the burden of demonstrating "a suitable and realistic plan for trial of the class claims."  *Zinser v. Accufix Research Inst., Inc.*, 253 F.3d 1180, 1189 (9th Cir. 2001); *see also Duran v. U.S. Bank N.A.*, 59 Cal. 4th 1, 28-29 (2014).

Here, Plaintiffs have not even attempted to set forth *any* trial plan, much less "a suitable and realistic" one.  Even if they tried, a trial plan is not manageable if a party's claims require individual analysis of each employee's claims.  *See, e.g., Wells Fargo*, 571 F.3d at 947; *Dukes*, 131 S. Ct. at 2561.  Liability here turns on over 1,200 FAs' individual experiences, making any trial hopelessly unmanageable.  *See Brady*, 2012 WL 1059694 at *6 (numerous class member statements that attest to "a wide variation in job duties and responsibilities" present a "significant risk that the trial would become an unmanageable set of mini-trials on the particular

1  individuals"); *Mendoza v. Home Depot, U.S.A. Inc.*, 2010 WL 424679, at *10 (C.D.

2  Cal. Jan. 21, 2010).  Also, given that FAs indisputably earn substantial amounts and

3  Plaintiffs' contention that they worked 60-65 hours per week, potential individual

4  recoveries could be substantial.  TAC ¶10; CE 6 ¶4; CE 7 ¶4.  Thus, arbitration is a

5  superior and available procedure for any FA seeking to pursue claims because

6  FINRA Rules require arbitration of claims not litigated in a class action.  *See*

7  FINRA Rule 13200; *Mendoza*, 2010 WL 424679 at *10 (class action would not be

8  superior because individual recovery was potentially substantial).  Thus, Plaintiffs

9  have not shown that a class action would be superior or a class trial manageable.

10  **E.    The Court Should Deny Certification Of Plaintiffs' Derivative California State Law Claims.**

11  Where, as here, Plaintiffs fail to establish Rule 23 requirements for overtime

12  and expense reimbursement claims, class certification of derivative claims for

13  improper wage statements, record keeping, waiting time penalties, various civil

14  penalties, PAGA, and unfair competition should be denied as well.  *See Coleman v.*

15  *Jenny Craig, Inc.*, 2013 WL 6500457, at *12 (S.D. Cal. Nov. 27, 2013) (denying

16  class certification for waiting time penalty and unfair competition claims where

17  underlying claims were not certified); *Litty*, Dkt. 90 at 7; *see also In re RBC*, 703 F.

18  Supp. 2d at 968-69 (denying certification of California law claims).[12]

19  **IV.   CONCLUSION**

20  For the foregoing reasons, the Court should deny Plaintiffs' Motion.

21  Dated:  August 25, 2014                    MORGAN, LEWIS & BOCKIUS LLP

22

23

24  By___/S/ Daryl S. Landy_____
                                                   Daryl S. Landy
25                                                 Attorneys for Defendant CHASE
                                                   INVESTMENT SERVICES CORP.

26

27  [12] Plaintiffs' TAC does not allege a claim for relief for failure to provide meal breaks.  Even if it did, Plaintiffs must first establish that individual inquiries do not

28  overwhelm their overtime misclassification claims, and then further establish that common evidence can demonstrate that CISC failed to provide meal breaks.